MASON v. WOLKOWICH. In re MASON. In re RUBIN. WOLKOWICH v. MASON.

(Circuit Court of Appeals, First Circuit. October 9, 1906.)

Nos. 625, 628.

**1. BANKRUPTCY—SALE OF ASSETS—AFFIRMANCE BY TRUSTEE.**

Where, after an alleged unauthorized sale of a bankrupt's assets, the trustee applied for an order directing that the proceeds be delivered to him, which was duly entered by the court, such act constituted an affirmance of the sale.

**2. SAME—BANKRUPTCY COURT—JURISDICTION.**

Aside from the power of the federal District Court with regard to the assets of bankrupts, which is especially given it by statute, it has all the authority which any court exercisng equitable jurisdiction has to protect its receivers and enforce contracts made by them.

**3. SAME—SALE OF ASSETS—COMPLETION OF CONTRACT—COURTS—JURISDICTION.**

Whenever a receiver of a bankrupt, by direction of the court appointing him, makes a sale of assets in his possession, the parties concerned are bound to recognize him as an officer of the court, and hence such court, not only has power to enforce in a summary manner the completion of the contract of sale, but the parties involved are deemed to have consented to such proceeding.

**4. SAME—COURTS—JURISDICTION.**

A federal District Court in which a bankruptcy proceeding was pending had jurisdiction to compel payment of the proceeds of a sale of the bankrupt's assets to the trustee by virtue of Bankr. Act July 1, 1898, c. 541, § 2 (7), 30 Stat. 545 [U. S. Comp. St. 1901, p. 3420], authorizing such court to cause the assets of bankrupts to be collected, reduced to money, and distributed, and to determine controversies in relation thereto.

**5. SAME—APPEAL—MODE OF REVIEW.**

Where proceedings were instituted by a bankrupt's trustee to compel payment to him of the proceeds of a sale of the bankrupt's assets, such

proceeding involved a controversy arising in bankruptcy proceedings, and was therefore reviewable on appeal, as provided by Bankr. Act July 1, 1898, c. 541, § 24a, 30 Stat. 553 [U. S. Comp. St. 1901, p. 3431], and not by petition to review.

6. ATTORNEY AND CLIENT—AUTHORITY OF ATTORNEY—SALE OF PROPERTY.
The general employment of an attorney at law as counsel and attorney by the receiver of a bankrupt does not authorize the attorney to make a sale of the bankrupt's assets, nor take the proceeds thereof.

7. JOINT AGENTS TO SELL PROPERTY—JOINT LIABILITY OF BOTH.
When the owner of personal property gave an attorney at law, who was under the ordinary employment by him as attorney and counsel, and another person, joint authority to sell the property and receive the proceeds, payment by the other person to the attorney of the amount received on the sale, without special authority from the principal, did not relieve either from the usual joint liability to account to the principal therefor and to pay the same to him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Agent, § 150.]

8. SAME—INTEREST.
Defendant having paid over the money in good faith, and the trustee having delayed for a period of two years in taking steps to recover the money, defendant should not be charged with interest.

Appeal from, and Petition for Revision of Proceedings in, the District Court of the United States for the District of Massachusetts.

Boyd B. Jones (David Stoneman, on the brief), for appellant Eber L. Mason.

James T. Pugh (Elder & Whitman, on the brief), for appellee Barnett Wolkowich.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge. One question involved relates to the jurisdiction taken by the court in bankruptcy over an alleged sale of a stock of merchandise which came into the hands of the receiver of a bankrupt's estate. The other question relates to the conclusions reached by the District Court on the merits of the controversy. After the sale the receiver was discharged, and the trustee took his place, having succeeded to all his rights. An order of the court had directed the disposal of the bankrupt's estate by public or private sale at the appraisal. The sale involved in this litigation was private for $1,700, which was something less than the appraisal, whereupon the trustee filed a petition in the District Court, alleging that the sale was unauthorized, but stating that the respondent Mason holds the $1,700, and asking an order that he pay this to the trustee. The decision was in favor of the trustee. The trustee's petition must be held to have been an affirmance of the sale by him, so far as in his power; and, of course, the action of the District Court in ordering the respondent to pay in the money effectually affirms, notwithstanding the inconsistent condition of the record in reference thereto.

The defense, as the respondent claims, raises questions both of law and fact. Thereupon the respondent came before us on appeal, and also by a petition to revise. Aside from the power of the District Court with regard to the assets of bankrupts, which is especially given it by the statutes, it has all the authority which any court exercising

equitable jurisdiction has to protect its receivers and the contracts made by them. Wherever a receiver, by direction of the court appointing him, makes a sale of assets in his possession, the parties concerned in the sale are bound to recognize him as an officer of the court; and consequently the court appointing the receiver, not only has power to enforce in a summary manner the completion of the contract of sale, but the parties involved are deemed to have consented to such a proceeding. Davis v. Gray, 16 Wall. 203, 216, 21 L. Ed. 447, and sequence. That proceedings of courts in bankruptcy are generally in the nature of proceedings by equity courts seems to be fully settled. Bardes v. Hawarden Bank, 178 U. S. 524, 535, 20 Sup. Ct. 1000, 44 L. Ed. 1175, and numerous other decisions. Consequently, on general rules, no objection to the summary method adopted by the District Court will lie.

In addition to its general powers arising under the common rules of the equity law by virtue of its appointment of a receiver, the District Court had jurisdiction over the controversy here under subdivision 7, of section 2 of the act of July 1, 1898 (30 Stat. 545, c. 541 [U. S. Comp. St. 1901, p. 3420]), where it is authorized "to cause the assets of bankrupts to be collected, reduced to money, and distributed, and determine controversies in relation thereto." The expression "except as herein otherwise provided," following the above words, does not apply here. Also, the Supreme Court, in discussing this question, refers to subdivision 15, authorizing the District Courts "to make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary to the enforcement of the provisions of this act." The breadth of the power thus given is apparent from Bryan v. Bernheimer, 181 U. S. 188, 21 Sup. Ct. 557, 45 L. Ed. 814, and White v. Schloerb, 178 U. S. 542, 20 Sup. Ct. 1007, 44 L. Ed. 1183. In each of the cases cited the appeal was by a petition in review; but they determined nothing with reference to the form of appeal, and we refer to them, and also to Metcalf v. Barker, 187 U. S. 165, 176, 23 Sup. Ct. 67, 47 L. Ed. 122; Lucius v. Cawthorn-Coleman Company, 196 U. S. 149, 152, 25 Sup. Ct. 214, 49 L. Ed. 425, and Whitney v. Wenman, 198 U. S. 539, 25 Sup. Ct. 778, 49 L. Ed. 1157, for the sole purpose of showing that the summary jurisdiction of the courts in bankruptcy is sufficiently broad to reach this case. Moreover, in Burleigh v. Foreman, 125 Fed. 217, 60 C. C. A. 109, decided on September 22, 1903, we explained the powers of the District Courts in these respects. Therefore, in any view, the District Court had power over this controversy on a summary petition.

We are next compelled to meet the question whether we can only revise matters of law on a petition, or whether the whole case may come up on appeal. We have, however, jurisdiction on appeal. In Hutchinson v. Otis, 115 Fed. 937, 941, 53 C. C. A. 419, we cautioned the profession that, theretofore, careful discriminations had not been made in this respect, and that the whole topic was reserved. Later, in Burleigh v. Foreman, 125 Fed. 217, 60 C. C. A. 109, decided on September 22, 1903, we held that section 24a of the act of July 1, 1898 (30 Stat. 553, c. 541 [U. S. Comp. St. 1901, p. 3431]), which invests "appellate

jurisdiction of controversies arising in bankruptcy proceedings in courts of bankruptcy," gives appellate jurisdiction over the District Courts, sitting in bankruptcy, wherever there is a controversy of a character justiciable in other courts. We pointed out at page 220 of 125 Fed., page 112 of 60 C. C. A., that, like ourselves, the Supreme Court to that time had not discriminated in reference thereto, and observed as follows:

"But, clearly, 'proceedings of the several inferior courts of bankruptcy' and 'controversies arising in bankruptcy proceedings,' as to the latter of which appeals to the Circuit Court of Appeals are expressly allowed by section 24a, may take on entirely different characters."

The question there was one of marshaling assets as between a bankrupt partnership and individual partners; the assets being under the control of the District Court in bankruptcy. We observed that the subject-matter involved was not in any way peculiar to bankruptcy, and that the controversy was governed entirely by the principles of the common law and the rules of equity, so that an appeal under section 24a was allowable. Thus a broad distinction was made, based entirely on the nature of the question in controversy, independently of the method in which the litigation originated.

About the same time the Supreme Court, in Holden v. Stratton, 191 U. S. 115, 118, 119, 24 Sup. Ct. 45, 46 (48 L. Ed. 116), in what was a dictum, made the same distinction between "bankruptcy proceedings" proper and "controversies"; and the opinion observed that "the provisions of the statute as to revisions of matters of law and appeals were framed, and must be construed, in view of that distinction." The question, however, arose squarely in Hewit v. Berlin Machine Works, 194 U. S. 296, 300, 24 Sup. Ct. 727, 48 L. Ed. 994, where the Berlin Machine Works claimed a lien on certain machinery in the possession of the trustee in bankruptcy, and filed a petition in the District Court to establish its claim. The District Court decided in its favor, and the trustee appealed to the Circuit Court of Appeals, and also filed a petition for revision of matters of law. The Supreme Court cited Burleigh v. Foreman, and sustained its conclusions, and also the appeal then before it, which would not have lain if the proceeding below had been by a petition for revision. The same practice, involving a question of a lien of the York Manufacturing Company on property in possession of a trustee in bankruptcy, was followed in all respects in the later case of York Manufacturing Company v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782.

The only case which apparently contravenes this result is First National Bank v. Chicago Company, 198 U. S. 280, 25 Sup. Ct. 693, 49 L. Ed. 1056. This, as found in the Court of Appeals, is reported in Re Rodgers, 125 Fed. 169, 60 C. C. A. 567. Here it appears that the property in question was sold by the order of the District Court, and the title of the various claimants to it was afterwards determined. The property was held by the Supreme Court not to have been in the possession of the bankrupt at the time the proceedings in bankruptcy commenced, and therefore not reachable by summary proceedings. The District Court, nevertheless, had taken possession of it and ordered a

sale. The Supreme Court, on certiorari to the Circuit Court of Appeals, held that the District Court had no jurisdiction, and that the proceeds of the property should have been returned to the respondents, with the right to litigate in the proper court. It also held that the proper proceeding was by petition for revision; but, in this particular, the court regarded only the order directing a sale. The summary order by a bankruptcy court for a sale may, perhaps, be held to be merely a "proceeding in bankruptcy" under the express provisions of the statutes authorizing it. The controversy as to the title to the property which the District Court proceeded to determine after it was sold was not taken cognizance of by the Supreme Court. Of course, there are always liable to arise doubtful cases, where it is a question on which side of the line they fall; that is, whether there is a mere "proceeding in bankruptcy" or a "controversy." That the Supreme Court, in First National Bank v. Chicago Company, regarded the case as one of the former class, cannot controvert the broad distinction laid down by it and ourselves in the decisions referred to. Neither Hewit v. Berlin Machine Works nor Burleigh v. Foreman was cited, nor the slightest indication given of any intention to overrule or modify either of them. Moreover, York Manufacturing Company v. Cassell, which we have already cited, was decided after First National Bank v. Chicago Company; and in Security Warehousing Co. v. Hand, 143 Fed. 32, 38, 74 C. C. A. 186, the Circuit Court of Appeals for the Seventh Circuit explicitly held that Hewit v. Berlin Machine Works was not impaired by First National Bank v. Chicago Company.

None of the cases cited made any distinction with regard to the method of proceeding in the appellate tribunals, based on the manner of the origin of the controversy in the District Court; that is to say, based on the proposition that the litigation was commenced by the trustee, or, vice versa, that it was commenced by the adverse claimant. Expressions in Hinds v. Moore, 134 Fed. 221, 223, 67 C. C. A. 149, support our propositions. This petition to revise must, therefore, be dismissed without prejudice, and the controversy between the parties be taken cognizance of on the appeal.

The question on the merits arises as follows: The trustee filed his petition in the District Court on August 4, 1904, setting out the facts we have already stated, and particularly alleging that on June 26, 1902, the respondent Mason sold to the Raymond Syndicate the property in question for $1,700; that the sale was made by Mason at less than the appraisal, in violation of the order of the court, an allegation which, as we have said, was rendered nugatory by what has transpired; and that Mason now holds the $1,700 without any title thereto, and against the right of the trustee. Thereupon the petitioner prayed the court to order Mason to pay over to him, as such trustee, the $1,700. The only allegations of Mason's answer we need refer to are that the receiver appointed Tworoger, an attorney and counsellor at law, practising in the District Court, "as his counsel, to act for him in all matters appertaining to his duties as receiver of the above estate." He adds: "Said Tworoger, acting as counsel for the receiver, requested the re-

spondent to assist him in finding a purchaser for the stock in trade of the bankrupt estate"; and that "said Tworoger instructed the respondent to sell said assets to the highest bidder"; and "that, acting upon said request of said Tworoger, the respondent sold said assets to the Raymond Syndicate for $1,700, and immediately upon the receipt of said $1,700 from said Raymond Syndicate, he paid the same to said Tworoger." He claims that this payment discharged him from all liability on the ground that Tworoger was the receiver's agent authorized to close the matter.

The facts as we find them do not correspond to the pleadings of either party; but neither presented the case strictly in accordance therewith, and, as is quite customary with summary bankruptcy proceedings, each has laid before us the merits, regardless of the pleadings, so that we do not feel called on to depart from the issues as actually shown by the proofs, or to raise any question of variance.

This brings us to several certificates from the referee, to whom the case was committed and afterwards recommitted, and also to the opinion of the learned judge of the District Court, who evidently gave much attention to the case, and, as we have already said, entered a decree for the trustee, against which this petition and appeal were taken. In addition to the certificates of the referee, the proofs taken before him are sent up to us, consisting of the testimony of respondent Mason, Receiver Spencer, and one Dorr, who acted in the matter for the Raymond Syndicate. Tworoger having absconded, his evidence does not appear. Of course, as the proofs are before us, we are bound only so far as our judgment approves them, by either the certificates of the referee or the opinion of the learned judge of the District Court, which, as is well settled, is in no sense a formal finding of the facts. As the learned judge of the District Court and the referee reached different results, we are not troubled by the rule of the Supreme Court with reference to the great weight to be given to two concurring conclusions; and, as we arrive at the same result as was reached by the District Court, and as, on an examination of the testimony of the witnesses, by which we must be governed, the case seems quite simple, we are not required to explain further what appears in either the certificates or the opinion.

The precise issue seems to be that, on the one hand, the trustee claims that Mason was the principal actor in making the sale of the merchandise, or, at least, one of the principal actors; while, on the other hand, Mason claims that he only aided Tworoger by showing the goods and hunting up purchasers. There is no sufficient proof that Mason did not regard Tworoger as the immediate agent of the receiver, nor pay the $1,700 in good faith. Nevertheless, as Mason received the proceeds of the sale into his own hands, and as, regarding the sale as valid, which we must do on this record as we have shown, those proceeds belonged to the receiver, it rests on Mason to show that he was authorized to turn them over to Tworoger. This the proofs in the record fail to accomplish. As we have said, Mason received the purchase money from the Raymond Syndicate, and simultaneously gave the following receipts:

"June 26, 1902.

"Received from George J. Raymond $700, in payment of stock at the store 588 Main Street, Worcester, Mass. $700. E. L. Mason."

"June 26, 1902.

"Received from George J. Raymond one thousand dollars in payment of stock at store 588 Main Street, Worcester, Mass. $1000. E. L. Mason."

Why he gave two receipts instead of one the record fails to explain, and therefore this must be regarded as an irrelevant fact. He gave them, however, in his own name, and their terms are such as to indicate on their face that he was, at least, one principal actor in conducting the sale. Moreover, Mason indorsed for collection the check given for the $1,700, with the name of his partnership, Mason & Snow. It therefore rests on him to show that he was not a principal actor, and to show, in addition thereto, that Tworoger was authorized to take the funds as the agent of the receiver and give him an effectual discharge. There is no testimony which the law recognizes to the effect that Tworoger had any such authority. Mason testified to some conversations with Tworoger, which, even if admissible, are of a doubtful character. First, he testified:

"Q. Did he have any talk with you after the appointment of Spencer as receiver, with respect to the sale of the goods at Worcester? A. No, sir; only that the receiver authorized him to have me sell the goods. I asked him if the receiver knew of it, and, in his familiar way, he said: 'Good Lord, man! do you suppose he does not know what is going on?'"

This is to the effect that "me"—that is, Mason—was authorized to sell the goods, and not at all to the effect that Tworoger was so authorized. Later, Mason testified:

"Q. What, if anything, did he say to you about Spencer, or Spencer's desire in the matter? A. Nothing; but I knew Mr. Spencer was receiver and that Mr. Tworoger was acting under his advice, because I asked him several times, 'Is this all right?' At that time I had begun to misplace confidence in Mr. Tworoger, and that was why I was so anxious to find out. Q. Did you ask him, in substance, if he was authorized by the receiver to sell those goods? A. Yes. Q. What did he say to you in reply? A. He said, 'Good Lord! yes, man.' Q. Was it in consequence of those directions that you went to Worcester and looked at the goods, and went to the Raymond Syndicate and effected the sale? A. Yes, sir."

Therefore Mason's testimony, even if admissible, was contradictory; but, as it was only in regard to conversations between himself and Tworoger, which were not shown to have been brought to the knowledge of the receiver, it is not admissible, and cannot be considered for the purpose of affecting the rights of the trustee or the issues on this appeal.

Spencer, the receiver, admitted that Tworoger was his counsel, and generally that he was acting for him in the entire matter, and that he (Spencer) did not undertake to make this sale and had "no business knowledge." Then this followed in his testimony, in regard to Tworoger:

"Q. Expecting him to see that the proper entries were made, the goods properly sold— A. I had confidence in what he said, and I knew Mr. Mason was with him in the matter, and I knew Mr. Mason was a reputable business man

and had a good name in the community. I knew he was connected with Mr. Tworoger, and I knew he was responsible for anything that took place, and that Mr. Tworoger was also responsible. That was my opinion at the time."

All this is brought down closely to this transaction by the following additional testimony of Spencer:

"Q. You expected they would act fairly and honestly and convert the goods into cash and make proper returns? A. The following morning Mr. Tworoger came to me, saying, 'Let me have the keys to the place. We are going to appraise the place and sell it.' And I gave him the keys."

"The Referee: You mean the morning after you came to Worcester? A. Yes; we came to Worcester the 17th, and it was the following morning."

"Q. You gave Mr. Tworoger no express directions regarding this sale of the goods? A. Except that what I said took place on the 18th. He said, 'Give me the keys. We are going to have this stuff appraised and sold.' And I gave him the keys. Q. That is all you know about the sale of the place? A. Yes."

Of course, the general employment of Tworoger by Spencer as counsel and attorney did not cover authority to make the sale and take the proceeds thereof. When we come to the precise conversation between Spencer and Tworoger which governed the authority to make the sale, and which is the only authority therefor appearing in the record, it is controlled throughout by the word "we," which means Tworoger and Mason. This is in harmony with what Spencer himself testified, showing that he relied on the fact that Mason was with Tworoger in the matter, that Mason was responsible for anything that took place, and that Tworoger was also responsible. The most that this shows is that, apparently, Mason and Tworoger were joint actors and were jointly authorized, so that the two were jointly responsible for the proceeds of the sale; and the payment thereof by either to the other—that is, the payment of the proceeds of the sale by Mason to Tworoger, or vice versa—was a mere transaction between themselves, which would not release or change the joint liability to Spencer, the receiver. If both were originally liable for the $1,700 on this record, and as the record shows that Tworoger has absconded and cannot be reached by the process of the court, Mason remains liable to respond severally for the entire amount. Therefore Mason has not relieved himself from the prima facie obligation indicated by the form of the receipts which he gave the Raymond syndicate; and the decree of the District Court, so far as it established generally his continuing liability, was correct.

We understand, however, that the District Court awarded interest against Mason from June 20, 1902, which was the date of the sale. The petition of the trustee against Mason was filed, as we have already said, August 4, 1904, a delay of over two years. This delay by the trustee, or by the creditors, who are the real parties in interest, strongly suggests acquiescence in the payment by Mason to Tworoger. However, no issue of this character was presented, so that we could not pass, directly on the suggestion; but, in view of the facts that the proofs are not sufficient to show that Mason did not pay the money to Tworoger, in good faith, and that, if he pays interest, he pays that of which he never received any part, coupled with the possible suggestions arising from the laches in proceeding against him, there would be no equity in compelling him to pay interest, and this to such an extent as to justify

noticing it although there is no assignment of error in regard to it. Considering, however, that there is no such assignment, our order thereabouts cannot affect the question of costs.

The judgments will be as follows:

In No. 628, Mason, Petitioner, let there be a decree that the petition be dismissed, without prejudice, with costs for the respondent.

In No. 625, Mason v. Wolkowich, the decree of the District Court is modified as to payment of interest; the case is remanded to that court, with directions to enter a modified decree in favor of the trustee in accordance with the opinion passed down this day, and the appellee recovers the costs of appeal.

NOTE.—The following is the opinion of Dodge, District Judge, in the court below:

DODGE, District Judge. This petition was filed before the referee August 4, 1904. After a hearing upon it and the answer to it filed by Mason, the referee ordered on February 23, 1905, that Mason pay the trustee of this estate $1,700, with interest from June 26, 1902. Upon Mason's petition for review it was ordered in this court on April 7, 1905, that if Mason should pay to the trustee within a certain time the amount he received on his debt (as will appear below), with costs, there should be a recommittal to hear further evidence. Payment has been made as required, there has been a further hearing before the referee, and he has now recommended modification of his findings and decree made February 23, 1905. The referee's certificate of that date and supplementary certificate of March 27, 1905, relate to what took place before recommittal. The second supplementary certificate, filed May 15, 1905, contains the modifications now recommended. It will be convenient, in view of this multiplication of reports from the referee, to make a brief restatement of the material facts in the order of their occurrence.

On June 16, 1902, Tworoger, then a lawyer practising in Boston, filed an involuntary petition, which was the beginning of this case, as attorney for the three creditors therein named. One of the creditors was Mason & Snow, of Boston, a firm of which Mason, the respondent to this petition, was a member. On the same day, upon a petition by Mason, Tworoger obtained the appointment by the court of Joseph S. Spencer as temporary receiver. Spencer was a young and inexperienced member of the bar. He occupied desk room in Tworoger's office and acted wholly under Tworoger's orders.

On June 17th Spencer, having given bond as receiver, went to Worcester, where the bankrupt's property was, with Tworoger and Mason. Spencer took possession of the goods constituting the bankrupt's assets. He, with Tworoger and Mason looked them over. No talk was then had about selling them.

On June 18th Tworoger filed in court his appearance as counsel for the receiver, and also a petition by Spencer as receiver, for leave to sell the goods above referred to. On the same day an order was issued for the appraisal of the goods in the usual manner. Also, on the same day, upon Tworoger's demand, Spencer gave the keys of the store in Worcester in which the goods were to Tworoger. Tworoger came to him and said, "Give me the keys. We are going to have this stuff appraised and sold." Spencer gave him the keys and did nothing further personally about the sale, but left the entire management of it to Tworoger.

On June 19th the appraisers named in the order of June 18th appraised the goods under Tworoger's direction, at Worcester.

On June 20th the appraisers' report was signed by them. It does not appear to have been filed in court until July 10th. Their report sets the total value of the goods at $2,018.01. Also, on June 20th, Tworoger obtained from the court, on Spencer's petition for leave to sell, with the consent of the alleged bankrupt, an order that the goods be sold forthwith, at public auction or private sale, for a sum not less than the appraised value, the proceeds thereof to be deposited in court. Adjudication was made on July 26th.

On June 26th Mason sold or assumed to sell to the Raymond Syndicate of Boston the goods referred to in the above order for sale, received as payment therefor the sum of $1,700, and delivered the goods to the purchaser. Mason had been assured by Tworoger that the receiver had authorized him to have Mason sell the goods. Though less than the appraised value, $1,700 is found by the referee to have been as much as could be expected to be realized from the property sold. There was no public sale and no general notice to creditors. Spencer was not present at the sale, and does not appear to have known about it at the time.

Having obtained the $1,700 from the purchaser, Mason turned over the money to Tworoger. Tworoger gave Mason back out of it the full amount of Mason & Snow's claim against the bankrupt estate. This amount, however, Mason has now paid back to the trustee, under the order of court of April 7th, above mentioned. Tworoger also gave Mason back out of the $1,700 $90 13 for expenses alleged to have been incurred by Mason in connection with the sale. In his second supplementary certificate the referee finds that this latter amount also, with interest, should be repaid to the trustee.

Spencer, the receiver, never received from Tworoger the $1,700 or any part of it. He was not present, so far as appears, when Tworoger received it from Mason. On May 5, 1903, Spencer filed in court a final account as receiver, sworn to before Tworoger by him on May 2, 1903. The account has never been allowed by the court. In it he charges himself, among other items, with "cash received for stock from Raymond Syndicate, $1,650." No proceeds from the sale have ever been paid into court.

In his original certificate and his first supplementary certificate, which is to be taken in connection with the original certificate, Mason was held liable by the referee to account to the trustee for all the money he received as the proceeds of the sale. This result was reached, as I understand it, upon two grounds: First, because Mason did not appear to have had any knowledge of the order of sale, or of the fact that Spencer had been appointed receiver, or of the fact that Tworoger was acting with the receiver's consent as counsel for the receiver, so that the sale was regarded as a disposition by Mason, entirely without right, of property belonging to the estate; second, because Tworoger was Mason's own counsel before he became counsel for the receiver and was acting with Mason in the matter, in part for Mason's benefit, so that Mason's transfer to Tworoger of the proceeds of the sale could not exonerate him from accounting to the trustee if Tworoger failed to do so.

In his second supplementary certificate, however, made after taking further evidence upon recommittal, the referee finds that Mason did know that Spencer was receiver and that Tworoger was acting as counsel for him in that capacity, and that the possession of the property and the control of the proposed sale had been intrusted by Spencer to Tworoger. The view taken in consequence of the different facts thus found was that Mason's sale was proper because authorized by the receiver through Tworoger, and that transfer of the proceeds to Tworoger was, therefore, so far as Mason was concerned, equivalent to a transfer of them to the receiver which would exonerate Mason from further responsibility, except so far as he afterward received back, out of the proceeds, money which neither Tworoger nor the received had any right to give him.

It is obvious that the receiver had no right to resign to Tworoger the custody of the goods or the direction of the sale. In doing so, and in ceasing thereafter to exercise any personal control himself, he was unfaithful to his trust. His appointment implied personal attention by him to the care and disposition of the property; if he did not intend to devote such personal attention to the duties of the office, he ought never to have accepted the appointment. There are no doubt cases in which a receiver must of necessity act through agents or employés. There was no such necessity here, the property was all in one place, of small amount, and all the duties to be performed few and simple. No necessity whatever appears for the employment of counsel. Upon the facts shown the court would not have sanctioned any such employment, at least so far as the management of the sale was concerned. Employment of counsel to perform that part of the receiver's duties would certainly not have been ap-

proved by the court, and to perform them was no part of the proper duties of counsel, however employed. A sale made as this was, by persons never authorized to make it, could not have been upheld if its validity had been disputed at the time. The receiver has, however, accepted and adopted it, and whether the trustee could invalidate it on the facts shown need not be considered, since the trustee makes no such attempt, but seeks only the proceeds received by Mason.

The receiver is, of course, responsible for these proceeds. It was his duty to see that the proceeds of any sale sanctioned by him, as this has been, were paid into court as ordered. The fact that they have not been so paid in makes, him liable for them from the time they were received by Mason. They never ought to have been either in Mason's hands or in Tworoger's, and, however they have disappeared, the receiver is answerable for them, or his surety. There have been contempt proceedings against the receiver wherein it has appeared that he is wholly unable to pay. No action appears thus far to have been taken against his surety.

But even if the sale be treated as valid, and although the receiver and his surety are liable, I think that Mason is also liable. He cannot deny that he had, after the sale, $1,700 in his hands belonging, and known by him to belong, to this estate. He must be regarded as still having this fund in his hands unless he can show that he has so paid it over as to discharge his liability for it to the estate. I am unable to agree with the referee that his payment to Tworoger had that effect. Even if it be granted that Tworoger had authority from the receiver to conduct the sale, or let Mason conduct it, on the receiver's behalf, it does not follow that he had authority to settle with Mason for the proceeds so as to bind the estate. However it might have been in regard to the proceeds had Tworoger been representing the receiver only as counsel, I cannot hold that, as between Tworoger and Mason, Tworoger stood in the receiver's place. In the dealings between them Tworoger assumed to be counsel for both parties, and this Mason knew. He knew also that Tworoger was his own counsel before he undertook to represent the receiver, as the facts found by the referee fully show. The second ground upon which Mason was held liable by the referee in the original certificate seems to me sound, and none the less sound by reason of the different conclusions arrived at by the referee after recommittal, in regard to the control intrusted to Tworoger over the property by the receiver and Mason's reliance upon Tworoger's authority to make the sale. The proceeds of the sale were by the order of sale to be paid into court. Whoever had the proceeds was charged with the duty of seeing at least that they went into the receiver's hands. If Mason chose to rely upon Tworoger to perform this duty, under the circumstances shown, it seems to me that he did so at his peril, and that he and not the estate must bear the loss caused by Tworoger's defalcation or misappropriation. Dealings in which the same person undertakes to be counsel for both parties to such a transaction are to be regarded with suspicion. Here, as the referee found in his original certificate, and as he was undoubtedly right in finding, "it is very evident that Mason and Tworoger were acting together, in part for the benefit of Mason." I must hold, as the referee held in the original certificate, that "turning over the funds to Tworoger, his own counsel, did not exonerate him from accounting for the same."

A plea to the jurisdiction filed by Mason February 11, 1905, was overruled by the referee February 20, 1905, and is also before me on petition for review. I hold that the referee had jurisdiction to make his original order of February 23, 1905, which is hereby affirmed, except that the amount which Mason is to pay is to be reduced so as to give him credit for the amount paid under the order of court of April 7, 1905.